IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:21-cv-00084-M

ESTRELLA TORRES and TONY
WHEELER,

    Plaintiffs,

v.

IAP WORLDWIDE SERVICES, INC. and
READINESS MANAGEMENT SUPPORT,
L.C.,

    Defendants.

ORDER

    Plaintiffs Estrella Torres and Tony Wheeler brought this action against Defendants IAP Worldwide Services, Inc. ("IAP") and Readiness Management Support, L.C. ("RMS"), alleging that Defendants retaliated against Plaintiffs for engaging in protected activity under the False Claims Act ("FCA"). Pending before the court is Defendants' Motion for Summary Judgment. [DE 96]. For the reasons stated herein, the motion is granted.

I.     **Undisputed Facts**

    IAP is a United States government contractor that provides professional and technical services both domestically and abroad. Compl. [DE 1] at ¶ 10–11. RMS is a wholly owned subsidiary of IAP. *Id.* at ¶ 4.

    In April 2006, the United States Department of Defense established the Combined Security Transition Command-Afghanistan ("CSTC-A") as part of a joint American/NATO effort to rebuild Afghanistan. Afg. Freedom Restoration Act, Public Law 107-327 (2002). Through the CSTC-A, the United States contracted with IAP to provide support to the Afghan Ministry of the Interior

("MOI"). Compl. [DE 1] at ¶ 13. This first IAP contract (Designation No. W52P1J-13-D-0107) took effect on May 12, 2016. [DE 99-1] at 4.

Estrella Torres was hired to work on the First Contract as a Virtualization Engineer on November 20, 2016. Compl. [DE 1] at ¶ 1, 18. Her partner, Tony Wheeler, was hired in June 2017 as a Systems Engineer. *Id.* at ¶ 2, 18. American contractors working in Afghanistan are required to comply with Afghan immigration and visa policies. [DE 99-2] at 4–5. As such, they must secure a Letter of Authorization to obtain and renew work visas for each of their employees. *Id.*

Around this time, the Special Inspector General for Afghanistan Reconstruction ("SIGAR") conducted a financial audit of IAP Contract No. W52P1J-13-D-0107 for the period of May 12, 2026, through July 31, 2018. [DE 99-1]. A draft audit report was submitted to SIGAR on November 9, 2018, and a finalized report was submitted on January 25, 2019. *Id.* at 4. The report identified three deficiencies in IAP's internal controls and three instances of noncompliance with the terms and conditions of the delivery order and applicable regulations.[1] *Id.* at 3. Additionally, it found that several employees lacked necessary certifications. *Id.*

On May 26, 2018, Torres sent a Slack message to her entire IAP team, including her direct manager, Dwane Light, calling them "a bunch of buddy fuckers" and accusing them of "piss poor planning." [DE 99-3] at 2. Subsequently, on June 13, 2018, Light sent an email to Arnold Gerow, the IAP Project Manager, requesting that he terminate Plaintiffs' employment. [DE 99-4] at 1, 3. On June 20, 2018, Light sent Gerow a memorandum outlining more specifically the conduct he believed justified this request. [DE 99-5].

---

[1] Defendants emphasize that the audit did not find that IAP had committed fraud. [DE 98] at 9.

2

On June 23, 2018, NATO International Military Police ("IMP") submitted a report following a confrontation with Torres and Wheeler, who IMP believed to be providing food and water to wild dogs at Hamid Karzai International Airport ("HKIA"), in violation of Standard Operating Procedure ("SOP") 108, Section 4(i).[2] [DE 99-6] at 1–2, 5–6. During the interaction, despite being asked to stop feeding the dogs, Plaintiffs stated that they would continue to do so. *Id.* at 10. In sworn statements, both Plaintiffs admitted to watering the dogs, with Wheeler providing that he had watered the dogs "off base since 2006." *Id.* at 12, 14. Torres advised that she observed the confrontation with IMP and heard Wheeler shout, "you're probably the mother fucker that got rid of the dogs aren't you." *Id.* at 12, 14. Torres additionally stated that she did "not personally believe the dogs [were] chewing up [the] cables, which is why [they] continued to water the dogs." *Id.* at 15.

On August 2, 2018, Light once again asked Gerow to terminate Plaintiffs' employment. [DE 99-7] at 3. On August 22, 2018, Light and Lead Network Engineer Michael Ortiz and Lead Cyber Engineer Michael Taylor, submitted a memorandum to Gerow and Assistant Manager William Causey, opining that Plaintiffs should be fired for their unsatisfactory job performance, as well as for their inappropriate conduct and behavior with team members. [DE 99-8]. The same day, Gerow forwarded the memorandum and the NATO incident report to IAP's Human Resources

---

[2] The report additionally states that when IMP officers asked Wheeler to stop feeding and watering the dogs, he screamed at them and threatened to "fuck [them] up." [DE 99-6] at 7–8. The report also advises that when the officers informed Wheeler that the dogs were eating electrical cables and causing problems, he stated that "he [didn't] give a fuck." *Id.* at 10. Plaintiffs deny that they made any statements to IMP officers during the incident. Plt's Stmt. Mat. Facts [DE 101] at ¶ 21–22.

3

Department, who agreed to terminated Plaintiffs "for inappropriate and unprofessional behavior as well [as for] poor performance."[3] [DE 99-9] at 3.

Between August and September 2018, Gerow informed Plaintiffs that the First Contract was being terminated and that IAP had submitted a proposal for a second contract but was waiting for the government's response. Compl. [DE 1] at ¶ 77–78. Torres was originally slated to return for the Second Contract.[4] *See* [DE 99-10]. However, in August, Plaintiffs were both mailed termination letters, and IAP agreed to set their effective termination date for September 6, 2018. Compl. [DE 1] at ¶ 79. Over the next few months, Plaintiffs exchanged emails with Gerow, asking about the status of the Second Contract and inquiring as to whether Torres would be rehired. [DE 99-11]. Between October and November 2018, Torres applied to several other positions with IAP. [DE 99-12].

On October 26, 2018, IAP was awarded the Second Contract (Designation No. W15P7T-17-D-0146), which was to be performed from October 26, 2018, to November 25, 2023. [DE 99-13] at 3–4. Plaintiffs discovered that Torres had not been rehired in November 2018. Compl. [DE 1] at ¶ 82. In January 2019, Wheeler sent Gerow an email, stating, "I guess you lied to Star and I. We waited now I owe you one." [DE 99-11] at 8.

On February 19, 2019, Torres filed a complaint with SIGAR. [DE 99-14]; *see also* Compl. [DE 1] at ¶ 83. Therein, she made five allegations: (1) Causey and Gerow operated a bar serving

---

[3] Plaintiffs maintain that they were not actually fired for poor performance. Plt's Stmt. Mat. Facts [DE 101] at ¶ 30.
[4] Defendants argue that were never any plans for Wheeler to return on the Second Contract. *See* Def's Stmt. Mat. Facts [DE 97] at ¶ 32. In support of this position, they point to an email sent by Wheeler on September 12, 2018, where he states, "I know that I don't have a job but are you still going to bring Star back on the contract if that happens?" [DE 99-11] at 3. Plaintiffs deny that this was an admission by Wheeler that he did not have a job under the Second Contract. They point to Wheeler's deposition, where he contends that this language referred only to his employment status under the first contract. *See* Depo. [DE 99-18] at 47:4–25.

4

alcohol; (2) Mark Hoyt, Gerow's direct supervisor, purchased a $1 million mobile data center ("MDC") that was neither needed for nor used during the contract; (3) IAP inappropriately profited from its relationship with subcontractor Zohak Technologies ("Z-Tech"); (4) Gerow used his connections with the NATO Support and Procurement Agency ("NSPA") to procure contracts for Z-Tech and Zohak Holding Group; and (5) Gerow hired Afghan prostitutes for parties at Zohak Village and smoked hash daily. [DE 99-14] at 4. Torres admitted in the SIGAR complaint that SIGAR had already completed an audit of the First Contract and had found no evidence that IAP committed fraud. *Id.* On February 23, 2019, Torres was contacted by SIGAR Agent Pete Hughes. [DE 99-15] at 11. The next day, following a telephone conversation between Torres and Hughes, Hughes acknowledged that Torres had not shared with anyone that she contacted SIGAR. *Id.* at 9.

On March 7, 2019, Wheeler emailed IAP's Director of Human Resources, complaining that IAP: (1) promised but failed to re-employ Torres under the Second Contract; (2) refused to return Plaintiffs' personal goods at its own expense; (3) placed Plaintiffs' lives in "immediate danger" by not sending a security detail to pick them up at the airport; and (4) engaged in "illegal and immoral practices" by terminating Plaintiffs' for their knowledge of the activities alleged in the SIGAR complaint. [DE 99-16] at 2–3.

On February 22, 2021, Plaintiffs brought this action against Defendants pursuant to 31 U.S.C. § 3729(a) and § 3730(h)(1). [DE 1]. On June 16, 2022, the United States informed the court that it would not intervene in this suit. [DE 19] at 1. The court subsequently unsealed the complaint and ordered Torres to inform the court as to whether she intended to proceed with her claims. [DE 20]. On July 21, 2022, Torres notified the court that she would voluntarily dismiss her § 3729 claim but proceed on her § 3730(h) retaliation claim. [DE 22] at 2. On September 1,

5

2023, the court declined to dismiss Plaintiffs' retaliation claim, reasoning that the complaint contained sufficient allegations that, if taken as true, would establish that Plaintiffs engaged in protected activity under the FCA. [DE 59] at 7–9. On August 23, 2024, after the conclusion of discovery, Defendants filed the pending Motion for Summary Judgment. [DE 97].

## II.    Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material "if proof of its existence or non-existence would affect disposition of the case under applicable law." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). An issue of material fact is genuine "if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Id.* When determining whether a genuine issue of material fact has been raised, the court must "view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted).

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes this threshold showing, the burden shifts to the non-moving party to show that "specific, material facts exist that give rise to a genuine issue." *Wai Man Tom*, 980 F.3d at 1037

(citing *Celetox Corp.* 477 at 324). It is insufficient for the non-movant to rely on allegations made in the pleadings or "conclusory allegations or denials." *Id.* Likewise, the "mere existence of a scintilla of evidence" in the non-movant's favor is insufficient to withstand summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III. Discussion

Plaintiffs brought this action against Defendants, arguing that they were terminated because Plaintiffs complained about Defendants' fraudulent wage payment and equipment procurement practices. Compl. [DE 1] at ¶ 101–02, 105. Defendants move for summary judgment, arguing that Plaintiffs did not engage in FCA protected activity prior to their termination, and even if they did, no reasonable jury could find that Defendants' actions were retaliatory. [DE 98] at 1. The court is persuaded by Defendants' arguments on both counts.

"The FCA is a statutory scheme designed to discourage fraud against the federal government." *Mann v. Heckler & Koch Defense, Inc.*, 630 F.3d 338, 342 (4th Cir. 2010), *abrogated on other grounds by United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200–01 (4th Cir. 2018). Its "cornerstone provision . . . prohibits any person from presenting a 'false or fraudulent claim for payment or approval' to the United States." *Id.* at 342–43 (citing 31 U.S.C. § 3729(a)). To that end, the FCA contains an anti-retaliation provision that creates a private right of action for "[a]ny employee, contractor, or agent" who is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against . . . because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop [one] or more violations of this subchapter." § 3730(h)(1).

A successful FCA retaliation claim requires a plaintiff to show that "(1) he engaged in protected activity; (2) his employer knew of the protected activity; and (3) his employer took

7

adverse action against him as a result." *Leverette v. Louise Berger U.S., Inc.*, No. 22-1891, 2024 WL 2355419, at *1 (4th Cir. 2024) (citing *Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir. 2013)). If a plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer "to articulate a legitimate, nonretaliatory basis for the adverse employment action." *Leverette*, 2024 WL 2355419, at *2; *see also Walton v. Harker*, 33 F.4th 165, 176 (4th Cir. 2022) (applying the *McDonnel Douglas* burden-shifting framework to a Title VII retaliation claim); *Lestage v. Coloplast Corp.*, 982 F.3d 37, 47 (1st Cir 2020) (applying this framework to FCA retaliation claims). If the employer makes this showing, the burden shifts back to the plaintiff "to rebut the employer's evidence by showing that the employer's purported nonretaliatory reasons were pretextual." *Leverette*, 2024 WL 2355419, at *2.

The issue before the court, then, is whether a reasonable jury could find that Defendants' decision to terminate Plaintiffs' employment was occasioned because Plaintiffs engaged in protected activity under the FCA. *See Anderson*, 477 U.S. at 248.

### A. Protected Activity

Plaintiffs cannot show that they engaged in protected activity prior to receiving their termination letters in August 2018. Section 3730(h) defines two types of protected activity: (1) acts taken in furtherance of an FCA suit against the employer; and (2) acts calculated to prevent an FCA violation. § 3730(h)(1); *see also United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 201 (4th Cir. 2018). Plaintiffs have brought this suit under this second category. [DE 100] at 12. Under this type of claim, "an act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA." *Grant*, 912 F.3d at 201. A belief is objectively reasonable when the evidence shows that the plaintiff "believed his employer was violating the FCA, that his belief was reasonable, that he took

8

action based on that belief, and that his actions were designed to stop one or more violations of the FCA." *Id.* at 201–02.

While such actions need not lead to a viable FCA claim, as required under the first category of protected activity, "they must still have a nexus to an FCA violation." *Id.* In other words, the plaintiff's behavior must be calculated to prevent real or suspected fraud,[5] as "[w]ithout fraud, there can be no FCA violation." *Carlson*, 657 Fed. Appx. at 174. This can include "collecting information about a possible fraud, even before the plaintiff puts together all the pieces of the puzzle." *Young v. CHS Middle E., LLC*, 611 Fed. Appx. 130, 132–33 (4th Cir. 2015) (citing *Mann*, 630 F.3d at 343–44)). By contrast, "protected activities exclude those in which an employee fabricates a tale of fraud to extract concessions from the employer, or just imagines fraud but lacks proof." *Id.* at 133 (cleaned up).

Here, Plaintiffs assert two types of protected activity: communications with Gerow regarding (1) wage payments to Z-Tech employees; and (2) the procurement of unnecessary equipment. [DE 100] at 16, n.2. The uncontroverted evidence supports neither of these conclusions.

From the evidence presented, no reasonable jury could find that Plaintiffs engaged in protected activity by complaining about Defendants' wage payments. As alleged in their complaint, Plaintiffs contend that Defendants paid Z-Tech employees "at a rate significantly below that specified by the Contract and below the rate at which the United States was reimbursing Defendants for their costs." Compl. [DE 1] at ¶ 41. Plaintiffs allege that Defendants "kept the

---

[5] The Fourth Circuit has observed that "it is axiomatic that fraud involves a knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment." *Carlson*, 657 Fed. Appx. at 174 (quoting *Fraud*, Black's Law Dictionary (10th ed. 2014)).

9

difference between [Z-Tech's] actual labor costs and the amount reimbursed under the Contract," thus defrauding the United States. *Id.* at ¶ 42. Torres and Wheeler both claim to have raised concerns regarding this scheme to Defendants. *Id.* at ¶ 101. If proven, this arrangement would certainly constitute fraud, and Plaintiffs' complaints to Gerow would qualify as protected activity. *See Young*, 611 Fed. Appx. at 133 (finding that an internal complaint qualified as protected activity where the plaintiff alleged that defendants were "defrauding the government" and creating "potential liability"); *Grant*, 912 F.3d at 202 (same where the "complaints did not merely express concern about regulatory non-compliance, but instead alleged specific illegal, fraudulent conduct against the government"). However, Plaintiffs cannot show either that their belief was objectively reasonable or that they raised their concerns to Defendants with sufficient particularity.

Plaintiffs did not have an objectively reasonable belief that Defendants submitted fraudulent reimbursements to the United States. *See Grant*, 912 F.3d at 201. The evidence, taken in a light most favorable to Plaintiffs, shows that Wheeler observed two documents concerning wage payments:[6] (1) an itemized invoice detailing that IAP paid Z-Tech $300,000 for the monthly labor costs of 150 employees; and (2) a Z-Tech engineer's bank statement showing that he was paid roughly $600 for a month's work. Wheeler Depo. [DE 99-18] at 17:22–18:25, 19:24–20:20. Wheeler testified that from "talking to Afghans," he knew that Z-Tech did not employ "fifty Afghans, much less the 150 . . . that were claimed." *Id.* at 9:10–13. Further, he claimed that the engineer in question was initially promised a monthly salary of $1,800. *Id.* at 19:1–7. Critically, neither piece of evidence speaks to the reimbursement amounts solicited from the United States.

---

[6] Torres testified that she did see any expense reports relating to wages. Depo. [DE 99-17] at 48:1–15. Her knowledge of any such documents stems from information relayed to her by Wheeler. *See id.* at 48:10–12.

10

Indeed, Wheeler testified that he "never saw that documentation," and was privy only to the invoices between IAP and Z-Tech. *Id.* at 22:6–13.

Plaintiffs contend that these documents support a reasonable belief that "the government was charged more for labor than it actually cost" because Defendants were "paying the workers below a market wage." [DE 100] at 14. It does not. Wheeler testified as to the promised salary of one Z-Tech engineer, but there is no evidence describing the terms of his employment contract, the total number of Z-Tech employees, or any reimbursements received from the United States. While Plaintiffs do not need to have "all the pieces of the puzzle," without evidence connecting the alleged discrepancy in the number of employees and with reimbursement requests made to the United States, Plaintiffs' belief rests on compilation of inferences with no evidence of fraud. *See Young*, 611 Fed. Appx. at 132–33. This is not enough to survive summary judgment.

Further, to the extent Torres and Wheeler raised these concerns with Gerow, the evidence does not show that the complaints were designed to prevent fraud against the United States. Both Plaintiffs testified that they raised their concerns at "morning meetings" while they were still employed under the First Contract. Torres Depo. [DE 99-17] at 47:11–13; Wheeler Depo. [DE 99-18] at 12:3–10. Torres testified that she voiced her concern that Afghan employees "were getting paid a lot less" than they did during their previous employment, and when they were getting paid, it was often late. [DE 99-17] at 47:14–25. Further, she testified that Gerow threatened to fire anyone who brought this concern up again. *Id.* at 47:5–10. Wheeler similarly testified that "the Afghan employees [were] not getting paid enough," additionally stating that he did not know "where all this money was going." [DE 99-18] at 12:3–10. While Wheeler's latter comment comes closer to constituting protected activity, in context, it's clear that both Plaintiffs were attempting to call attention to the low wages paid to Afghan employees, not to any alleged fraud.

11

To avoid this conclusion, Plaintiffs submit declarations stating that they "took [these] steps to end . . . fraudulent practices." Torres Decl. [DE 102-4] at ¶ 2; Wheeler Decl. [DE 102-5] at ¶ 2. However, while "self-serving affidavits offered by the non-movant can sometimes defeat summary judgment," *Pfaller v. Amonette*, 55 F.4th 436, 450 (4th Cir. 2022), Plaintiffs do not create a genuine issue of material fact by offering identically drafted declarations that are inconsistent with their deposition testimony and unsupported by the remainder of the record. *See John v. Essentia Ins. Co.*, No. 23-310, 2024 WL 2978232, at *12 (D. Md. June 13, 2024). The evidence does not show that these complaints were designed to prevent fraud against the United States, so they do not constitute protected activity. *See Grant*, 912 F.3d at 201.

Neither is there a genuine issue of material fact as to Plaintiffs second category of protected activity. Plaintiffs allege that that Gerow purchased an MDC for use on the First Contract even though he "knew, or should have known, that the MDC was unnecessary to complete the Contract at the time of purchase." Compl. [DE 1] at ¶ 60, 63–64. Plaintiffs allege that Gerow and Causey used the equipment "for their personal uses outside the scope of the Contract" and ultimately sought reimbursement for the MDC from the United States. *Id.* at ¶ 65.

As with the wage allegations, a reasonable jury could not conclude that complaints made regarding this procurement were designed to prevent fraud against the United States. Both Plaintiffs testified that they raised their concerns regarding the MDC with IAP management. Torres stated that she expressed her frustrations with Gerow because the equipment continued to overheat, and given its cost, she wanted to know if IAP "could procure a better solution that would work" so that IAP could return the MDC.[7] Depo. [DE 99-17] at 20:23–21:7, 36:16–23. Wheeler

---

[7] When asked how the purchase of the MDC violated the FCA, Torres testified that: "[T]he contract called for disaster recovery solution. This could have been a solution, but it never worked. So it

12

testified that he complained about the MDC because he considered it ill-suited for "use[] in Afghanistan." Depo. [DE 99-18] at 28:19–29:21 Neither of these complaints remotely concern fraud. Plaintiffs expressed their dissatisfaction with the MDC's utility, but they did not reference the United States beyond to state that the money spent on this equipment was "wasted" by the government. Torres Depo. [DE 99-17] at 21:11–12. Waste and fraud are different things. Imprudent spending habits do not amount to a "knowing misrepresentation or knowing concealment of a material fact." *Carlson*, 657 Fed. Appx. at 174 (quoting *Fraud*, Black's Law Dictionary (10th ed. 2014)). Without evidence beyond this testimony, Plaintiffs cannot show that they reasonably believed Defendants were defrauding the government or that they made complaints alleging as much.

Plaintiffs' argument regarding the software licenses runs along a similar vein. The complaint alleges that Torres "confronted Mr. Light about the purchase of unnecessary software and licenses" because she believed the money should have been used acquire "needed tools for the job." Compl. [DE 1] at ¶ 73. Torres testified that she complained to Light about not having the proper software licenses to complete the full scope of her work. Depo. [DE 99-17] at 50:19–51:14. She stated that she was mainly using "test licenses or trial licenses," opining that IAP lacked the resources to obtain proper software because they spent money on other pieces of equipment, such

---

didn't help—it didn't fulfill its obligations for the contract. And number two, when there is a vested interest with Mark Hoyt and Carl, it seems like this was a solution, an overpriced solution pushed on the contract to line their pockets." Depo. [DE 99-17] at 37:6–14. A purchase by an employer does not become fraud simply because it has less utility than expected, so much of Torres' explanation falls flat. As to her reference to a "vested interest," this could, in some scenarios, serve as the underpinning of an FCA violation, but Torres does testify that her motivation in complaining about the MDC was to prevent Hoyt and Carl from unduly profiting from this purchase; indeed, she testified only as to her frustration with the equipment itself. *See id.* at 20:23–21:7, 36:16–23. Accordingly, the court finds this testimony insufficient to create a genuine issue as to whether Torres engaged in protected activity.

13

as the above-described MDC. *Id.* at 50:19–51:14, 57:12–58:25. For the reasons described above, such complaints are insufficient to qualify as protected activity because they concern Plaintiffs' disagreement with IAP's discretionary purchases, not with any alleged fraud against the United States.

In sum, no reasonable jury could find that Plaintiffs engaged in activity designed to prevent a violation of the FCA.

### B. Causation

Plaintiffs cannot show that they engaged in protected activity, so their claim fails as a matter of law. *See Glynn*, 710 F.3d at 214. Even if they could, they cannot show that Defendants' decision to terminate Plaintiffs was retaliatory.

The FCA entitles an employee to relief when the employee is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because" they engaged in FCA protected activity. § 3730(h)(1). "The discharge of an employee soon after he engages in protected activity is strongly suggestive of retaliatory motive and gives rise to a sufficient inference of causation to satisfy the prima facie requirement." *Chapins v. Nw Cmty. Servs. Bd.*, 243 F.Supp.3d 379, 749 (W.D. Va. 2017) (quoting *Coursey v. Univ. of Md. E. Shore*, 577 Fed.Appx. 167, 175 (4th Cir. 2014) (applying this principle to an ADA retaliation claim)). While such temporal proximity is significant, "the causal connection may be severed by the passage of . . . some legitimate intervening event." *Chapins*, 243 F.Supp.3d at 749 (quoting *Feldman v. Law Enforcement Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014) (applying this principle to a Sarbanes-Oxley retaliation claim)).

Here, even assuming Plaintiffs both suffered adverse employment action, they do not show retaliatory intent. In their brief, Plaintiffs fail to address the reason for their termination until

14

Section IV, where they argue that Defendants' proffered explanation is pretextual. *See* [DE 100] at 23. In fact, the only prior suggestion of Defendants' motivation appears in the first sentence of Section III, where they state that "Plaintiffs complained, were threatened with termination, and ultimately fired for dubious reasons, as discussed below." *Id.* at 21. Notably, the remainder of Section III does not attempt to create a causal link between Plaintiffs complaints and their termination; instead, it argues only that Plaintiffs suffered adverse employment action. *Id.* at 21–23. In doing this, Plaintiffs assume they have made a prima facie retaliation claim without affirmatively showing causation. This assumption is erroneous. The burden to offer a non-retaliatory rationale flips to an employer *only after* an employee can show that they suffered adverse employment action "as a result" of engaging in FCA protected activity. *Leverette*, 2024 WL 2355419, at *2. Plaintiffs have offered no evidence to that effect.

A rationale jury could not otherwise infer that the causation prong is met. From the evidence presented, it is unclear how much time passed between Plaintiffs' complaints and their termination because the evidence of these complaints consists almost entirely of deposition testimony wherein Plaintiffs do not recall when these events transpired. *See, e.g.*, Torres Depo. [DE 99-17] at 47:11–13; Wheeler Depo. [DE 99-17] at 11:23–12:13. But even assuming they happened in close temporal proximity to Plaintiffs' termination, the June 23, 2018, encounter with NATO IMP operates as a "legitimate intervening event." *See Chapins*, 243 F.Supp.3d at 749. On August 2, 2018, following receipt of IMP's incident report, Light recommended that Gerow terminate Plaintiffs' employment. [DE 99-7] at 3. Gerow submitted the report to IAP's Human Resources Department on August 22, [DE 99-9] at 3, and on August 27, Plaintiffs' termination letters were dated. Compl. [DE 1] at ¶ 79. As stated previously, Plaintiffs offer no other evidence

15

which might speak to Defendants' motivation. Accordingly, they cannot show causation. This independently defeats their claim as a matter of law. *See Glynn*, 710 F.3d at 214.

## IV. Conclusion

For the aforementioned reasons, Defendants' Motion for Summary Judgment [DE 96] is GRANTED. The Clerk is DIRECTED to enter judgment in Defendant's favor.

SO ORDERED this 11th day of April, 2025.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE